UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

| | |
|---|---|
| ROBERT L.S., JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:18 CV 14 (JMB) |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On April 1, 2015, plaintiff Robert L. S., Jr., protectively filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of February 19, 2008.[2] (Tr. 223-26, 142). After plaintiff's application was denied on initial consideration (Tr. 155-59), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 164-65).

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] Plaintiff previously filed applications under Titles II and XVI. His first applications were denied on initial determination on April 1, 2008; an ALJ denied his second applications on February 16, 2012. (Tr. 242, 109-20).

Plaintiff and counsel appeared for a hearing on January 26, 2017. (Tr. 64-105). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Barbara Myers, M.S. The ALJ issued a decision denying plaintiff's applications on April 21, 2017. (Tr. 18-28). The Appeals Council denied plaintiff's request for review on December 19, 2017. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. **Evidence Before the ALJ**

**A. Disability and Function Reports and Hearing Testimony**

Plaintiff, who was born on August 22, 1965, was 42 years old on the alleged onset date. He lived alone in a house in walking distance of the homes of his parents and one of his sons. (Tr. 86). He completed high school and had a mixture of regular and special education classes. (Tr. 69-70). He previously worked as a truck driver and a farm laborer. (Tr. 70, 255).

When plaintiff applied for disability benefits in 2015, he listed his impairments as rib fracture, bulging discs, knee problems, shoulder problems, neck problems, and sleep disorder. He was 5-feet, 11-inches tall and weighed 358 pounds. (Tr. 246). In a Function Report completed in May 2015 (Tr. 263-70), plaintiff stated that he had a substantial amount of pain, which affected his abilities to walk, stand, sit, lift, and sleep. He used a cane around the house. He struggled to manage cooking, cleaning, bathing, and completing household tasks and relied on his son to do more labor-intensive chores. Plaintiff also took care of small dogs, although his son delivered dog food for him. His hobbies and interests included reading and watching television. He used to be able to work, hunt, fish, and pursue other recreational activities. As a result of his impairments, he was unable to stand for very long and all of his daily tasks took longer to complete. He struggled to dress and bathe. He did not sleep well at all due to pain and

apnea. His lack of sleep affected his mood and ability to get along with others. He had a driver's license and borrowed his father's truck to go to medical appointments, the lawyer's office, and grocery shopping. He had difficulty concentrating, finishing tasks, and following instructions. He got along "very, very poorly" with authority and did not handle stress or changes in routine well. (Tr. 268-69). Plaintiff had difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, completing tasks, concentrating, understanding, following instructions, using his hands, and getting along with others. He could walk "a matter of feet" before he needed to rest for a few minutes. In a narrative portion, plaintiff stated that he was in constant pain and did not sleep well. All his prior work had been as a laborer and he did not have any skills he could transfer to another field. Plaintiff's son David also completed a Function Report that is largely consistent with plaintiff's report. (Tr. 274-81). David added, however, that plaintiff was completely dependent on his son and parents for financial support and their capacity to help was being strained. David visited twice a week to bring supplies and help with chores. He stated that his father was in constant pain and had sleep apnea, was very difficult and stubborn, and was not capable of working. Furthermore, he added, "no one in their right mind would hire him." (Tr. 281).

Plaintiff traced his impairments to an injury in 2008.[3] Over time, his condition had deteriorated and he had pain from the time he got up in the morning and it worsened throughout the day. He testified that he had radiating pain from mid-back to his right knee. He felt pain after standing or sitting for 15 to 20 minutes. His primary care physician had told him that he was not a good candidate for back surgery. (Tr. 81). He spent a large portion of the day lying on

---

[3] Plaintiff testified that he fell in 2008 and sustained a costal fracture which then caused problems in his back. (Tr. 73). X-rays taken at the time of the injury did not show any fracture. (Tr. 317). Plaintiff told pain specialist Theresa Rickelman, D.O., that he sustained a second injury two weeks after the initial injury. (Tr. 334).

3

the floor to get some relief. He also did low impact stretching and, in the summer, swimming. He was able to walk to his father's home, a distance of about 300 feet, to watch the news before returning home to stretch on the floor again. Plaintiff had also sustained several injuries to his right knee which popped and caused pain if he took a long stride. In addition, he had previously broken his ankle. He was able to walk about 30 to 40 minutes before he experienced knee or ankle pain. (Tr. 72-73). He avoided climbing stairs because it caused pain. (Tr. 98).

Plaintiff's right rotator cuff was torn and he had a bone spur. As a consequence, lifting weights as light as a coffee cup caused pain. He had recently discussed surgery to address the tear in the rotator cuff and remove part of his collar bone. (Tr. 77-78). He was undecided about whether to have the surgery. He testified that, due to pain in his right knee, he needed both arms to get up in the morning or rise from a chair and he did not know how he would manage to take care of himself after surgery if he could not use his right arm. (Tr. 78-79). He described his left shoulder as worn out from factory work and testified that he had bursitis. Plaintiff had been treated with steroid injections, but the effects eventually wore off. He also had stiffness in his neck and nerve pain in his left arm. (Tr. 77). He had been prescribed medicines, but they "didn't work for [him] inside [and] affect[ed his] mental part a little bit." He took Naproxen, which dulled the pain somewhat. (Tr. 80, 308-09, 312).

Plaintiff testified that he had hypersomnia and had suffered from sleep apnea most of his life. He began CPAP treatment in 2011 or 2012. (Tr. 84). He tossed and turned all night and catnapped on the floor during the day. He often woke gasping for air. Plaintiff also had depression attributed to the decline in his physical health. He did not have an active social life, pursue hobbies, or have friends. He interacted with his son, who lived next door, and his parents, who lived half a block away; he also went to town meetings, where he was generally one of very

4

few people in attendance. (Tr. 81-82, 86, 91, 93). He was not able to concentrate long enough to watch a movie and had been diagnosed with attention deficit disorder (ADD/ADHD). (Tr. 91). His physician prescribed medication for the condition but discontinued it when it did not appear to be helping. (Tr. 91-92). Finally, he was obese and had tinnitus. (Tr. 82-83, 91).

In response to questions from the ALJ, plaintiff testified that he was able to prepare and clean up simple meals. His parents had a vegetable garden that he picked from and he had what he called "a green patch" in his yard that produced "tender greens" and "turnip greens." It reseeded itself each year and he did not till it or weed it. (Tr. 89-90). He used a rider mower to mow the lawn, a task that took about 40 minutes, after which he was "done for the day." (Tr. 90). In addition, he drove to appointments about once a month. After 20 minutes of driving, he had a burning sensation in his tailbone and his left leg went to sleep. (Tr. 87-88). He got a stiff neck from holding the steering wheel and had pain in his shoulder and nerve pain in his left arm.

Vocational expert Barbara Myers was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was limited to light work, who could frequently reach overhead in all directions bilaterally; who could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; could occasionally operate a motor vehicle and be exposed to vibration; and could work in a moderate noise environment. According to Ms. Myers, such an individual would not be able to perform plaintiff's past work, but could work as a cashier or a collator operator. (Tr. 101-02). There would be no work available if the individual were further restricted to only occasional reaching in all directions bilaterally. Similarly, there would be no work available if the individual needed additional breaks during the work day to elevate his legs or would be off-task 20% of the work day due to severe pain. (Tr. 102-03).

5

B. **Medical Evidence**

The administrative transcript includes records of plaintiff's medical treatment as far back as 2011. During the period under review, plaintiff had complaints of pain in his neck, low back, and shoulders, for which he was treated with medications, injections, and osteopathic manipulations. He was also diagnosed with and treated for sleep apnea, diabetes type II, gout, depression, anxiety, and attention deficit disorder. He was morbidly obese and was provided with dietary advice and exercise goals. In December 2013, he underwent a laparoscopic appendectomy. Plaintiff's primary argument is that the ALJ failed to address his complaints of shoulder pain and improperly concluded that he was capable of reaching overhead and in all directions frequently. Accordingly, the Court here discusses medical records bearing on this issue.

On April 15, 2013, plaintiff sought treatment at the Northeast Missouri Health Council, Inc., from primary care physician Melanie S. Grgurich, D.O., for pain in his right shoulder.[4] He reported that he felt it twist and pop while he was planting a garden. (Tr. 740-42). At that time, he refused imaging studies, pain medications, or referrals. A month later, he complained of bilateral shoulder pain that was aggravated by lifting and pushing. (Tr. 736-39). He experienced numbness, popping, locking, weakness, and tingling in his arms. He also complained of decreased mobility and insomnia. On examination, Dr. Grgurich noted that plaintiff had tenderness of the lumbar spine and shoulders. She gave plaintiff an injection of Toradol and encouraged him to go to a pain clinic. X-rays of the right shoulder showed normal glenohumeral articulation, mild downsloping acromion, and minimal osteoarthritis. With respect to the rotator cuff, the x-rays showed a small ossicle or the distal clavicle projecting over the rotator cuff,

---

[4] The record indicates that plaintiff received treatment at the Northeast Missouri health Council at least as early as April 2010. See Tr. 792 (referring to medical history taken on Apr. 26, 2010).

predisposing plaintiff to impression on the cuff. There was also suspected calcific tendinosis of the rotator cuff. (Tr. 332-33). On June 4, 2013, he continued to have reduced range of motion and tenderness in his shoulders. (Tr. 733-35). Dr. Grgurich administered a steroid injection to his left shoulder. Two weeks later, he reported that the injection provided pain relief for two days.

Plaintiff saw pain specialist Theresa T. Rickelman, D.O., on June 20, 2013. (Tr. 334-36). Plaintiff reported that he had pain in his neck, left arm and shoulder, low back, and legs. He also had numbness in his left arm and left leg, a sharp ache in his hands, and shooting pain in his left leg. On examination, Dr. Rickelman noted that plaintiff appeared to be in distress and was unable to sit in one position for any length of time. He needed assistance to heel-toe walk and squat. Forward and backward bending increased his low back pain and any movement of the left arm caused increased pain, especially in the shoulder. Dr. Rickelman noted that plaintiff's MRIs were very difficult to interpret due to his size but stated that it appeared he had degenerative disease in the low back and facet arthritis and degenerative disease in the cervical spine. Plaintiff complained that steroids made him jittery, so she prescribed Neurontin and Mobic. She directed him to exercise in water. Although he would have benefited from physical therapy, his insurance did not cover it. In July 2013, Dr. Grgurich noted that plaintiff had tenderness to palpation throughout his spine and shoulders, with mildly reduced range of motion. (Tr. 725-29). She injected plaintiff's left shoulder with lidocaine.

In September 2013, plaintiff told Dr. Rickelman that he still had a lot of pain, especially in the low back, and he had to change positions frequently. (Tr. 337-38). He was unwilling to consider further injections because the shoulder injection had not helped and did not feel like the Neurontin was effective. He was reluctant to try new medications, see a neurologist, or undergo

7

osteopathic manual medicine. Dr. Rickelman suggested that he could return in the future if he reconsidered these treatment options. Indeed, in January 2014, Dr. Rickelman noted that plaintiff was in so much pain that he was willing to undergo an epidural steroid injection to treat low-back and radicular left-leg pain. (Tr. 352-53).

Also in January 2014, Karen A. Sylvara, D.O., completed a disability consult. (Tr. 773-74). She listed plaintiff's chief complaints as two bulging discs in his low back, one moderate and one severe, bilateral shoulder pain with popping and crackling in the left shoulder, and gout. In addition, plaintiff reported that he had "shifting" vertebrae in his neck. He stated his pain was never below level 7 on a 10-point scale. He reported that gabapentin and Mobic were not effective and hydrocodone made him sweat. On examination, plaintiff had pain in his back, neck, and shoulder. Dr. Sylvara assessed plaintiff with a history of bulging discs, left shoulder pain with a history of tendinitis, right knee sprain, and osteoarthritis. She recommended that he be treated at a pain clinic.

On February 11, 2014, Tom Reinsel, M.D., of the Missouri Spine Center, evaluated plaintiff for complaints of pain that radiated to his left hand with constant tingling, chronic low- and mid-back pain that radiated to his left foot, and pain in the right buttock. (Tr. 358-59). The steroid injection administered by Dr. Rickelman had not provided relief. On examination, plaintiff was not in acute distress, was able to walk on heels and toes, and had a normal gait. He had "excellent" range of motion and normal extension. Palpation produced slight diffuse tenderness in the lumbar and cervical spine. Dr. Reinsel reviewed an MRI from 2012 and noted that it was "limited in the quality and number of images obtained." The MRI showed "some changes" in the cervical and lumbar spine but plaintiff's spine "structurally look[ed] fairly good." Surgery was unlikely to help plaintiff and Dr. Reinsel recommended that plaintiff

8

exercise regularly and lose weight, which might improve but would not eradicate his pain. In addition, he might benefit from seeing a rheumatologist.

There is a gap in the medical records until February 2015, when plaintiff began osteopathic manipulative treatment at the Gutensohn Clinic of the A.T. Still University. (Tr. 387-91). Plaintiff reported that he had pain in his neck, left shoulder, and low back that started in 2008. On examination, plaintiff had muscle tension and/or spasm throughout his spine with decreased ranges of motion plus restriction of the sacroiliac joint. Treatment improved the spine symptoms. Plaintiff was given home exercises and directed to attend the aquatic center. On his return on March 20, 2015, plaintiff reported some improvement in his back pain. (Tr. 382-86). Plaintiff had three more osteopathic treatments in April and May 2015. (Tr. 377-81, 372-76, 435-39). He reported nearly 100% improvement in his left hip pain. (Tr. 435). On examination, he continued to show muscle tension and/or spasm with decreased ranges of motion.

On April 6, 2015, plaintiff sought treatment at an urgent care center for sharp pain and popping in his ribs. He had moderate tenderness to palpation. X-rays showed no acute fracture. Plaintiff was given an injection of Toradol and a prescription for Meloxicam. (Tr. 401-04, 354, 426).

In June 2016, Joseph W. Novinger, D.O., of the Northeast Missouri Health Council, Inc., noted that plaintiff had bilateral shoulder pain with loss of grip and trouble lifting. (Tr. 911-14). On examination, Dr. Novinger noted that plaintiff had limited range of motion in the right

9

shoulder. Hawkin's test and the Drop Arm test[5] were positive. Dr. Novinger administered an injection to the subacromial joint of plaintiff's right shoulder.

On October 26, 2016, plaintiff was seen by Richard Wolkowitz, M.D., at the Samaritan Pain Clinic, on referral from Dr. Grgurich. (Tr. 48-50). According to plaintiff, his low-back pain was never below level 7 on a 10-point pain scale. He spent a good part of his day lying on the floor trying to relieve his pain. He also reported some sensory changes in his arms and legs and weakness in his hands. He tended to drop things. He did not like the side effects of Percocet and took Naprosyn for pain relief. An MRI of the lumbar spine revealed facet arthritic changes, mild degeneration, moderate disc bulging, mild loss of disc height, and bilaterally severe neuroforaminal stenosis at L5-S1. He also had mild spondylosis of the cervical spine. On examination, plaintiff had tenderness to palpation of the spine. Beatty's maneuver and Patrick's test were both negative, while straight leg raises and Fortin's sign were positive.[6] Plaintiff had full range of motion of his limbs and was able to abduct his arms to 180 degrees. Dr. Wolkowitz assessed plaintiff with sacroilitis, neuroforaminal stenosis, cervical spondylosis, and shoulder bursitis and gave him a steroid injection in the thoracic region. At follow-up in December 2016, plaintiff reported that his left-sided cervical radiculitis had resolved. (Tr. 46-47). He still had paresthesias in his left arm and low back pain. Dr. Wolkowitz treated plaintiff with lumbar facet

---

[5] The Hawkin's test is used to identify possible subacromial impingement syndrome. https://www.physio-pedia.com/Hawkins_/_Kennedy_Impingement_Test_of_the_Shoulder (last visited Apr. 10, 2019). The Drop Arm test is used to assess rotator cuff tears, particularly of the supraspinatus. https://www.physio-pedia.com/Drop_Arm_Test (last visited Apr. 10, 2019).

[6] Beatty's maneuver is a test for piriformis syndrome characterized by buttock and hip pain. https://www.physio-pedia.com/Piriformis_Syndrome (last visited Apr. 10, 2019); Patrick's test is used to diagnosis pathologies in the hip, sacroiliac, and lumbar region. https://www.physio-pedia.com/FABER_Test (last visited Apr. 10, 2019); the Fortin test is used to evaluate the sacroiliac joint. See https://www.physio-pedia.com/Sacroiliac_joint (last visited Aor. 10, 2019).

medial nerve branch blocks. Based on examination and plaintiff's response to the procedure, Dr. Wolkowitz opined that plaintiff had thoracolumbar facet spondylosis.

On January 8, 2017, Dr. David Louis Flood, M.D., evaluated plaintiff's right shoulder pain. (Tr. 36-37). On examination, plaintiff had slightly reduced ranges of motion, positive impingement signs, and reduced supraspinatus strength. Imaging studies showed minimal degenerative changes, a Type III acromion, and torn supraspinatus. Plaintiff was diagnosed with a torn rotator cuff of the right shoulder which Dr. Flood proposed repairing with arthroscopic surgery.

2. Opinion evidence

On October 21, 2016, J. Tod Sylvara, D.O., completed a disability examination. (Tr. 1006-07). Dr. Sylvara reported that the examination was normal other than plaintiff's obesity. Plaintiff had good range of motion of the spine, arms, and legs. Dr. Sylvara opined that plaintiff had the ability to perform "many types of work," with the exception of hard labor. The ALJ noted that Dr. Sylvara was an examining source and had not had the opportunity to observe plaintiff over a period of time. The ALJ found that Dr. Sylvara's opinion was not consistent with objective diagnostic evidence of chronic pain and gave the opinion limited weight. (Tr. 25)

On December 30, 2016, primary care physician Dr. Grgurich completed a medical source statement. (Tr. 1019-20). She listed plaintiff's symptoms as neck, low back, and bilateral shoulder pain. At his most recent office visit, he displayed impaired mobility throughout the spine, right shoulder tenderness, and morbid obesity. His diagnoses of the spine included osteoarthritis, degenerative joint disease, degenerative disc disease, and spinal stenosis. He also had osteoarthritis of the shoulder and knee. His treatments had included joint injections, epidural steroid injections, weight loss, and physical therapy. Dr. Grgurich opined that plaintiff was able

11

to stand for 15 minutes at a time, sit for 15 minutes at a time, occasionally lift 20 pounds, frequently lift 10 pounds, frequently manipulate, and occasionally raise his arms over shoulder level. She further opined that he could work for one hour a day and needed to elevate his legs for most of an 8-hour work day. The ALJ gave this opinion partial weight. (Tr. 25). In particular, the ALJ found that Dr. Grgurich's findings that plaintiff could perform light work and frequently manipulate were consistent with the objective diagnostic and clinical findings in the record. The ALJ found that Dr. Grgurich's opinion that plaintiff could only work one hour a day was not consistent with his testimony regarding his daily activities, such as caring for pets, preparing meals, driving short distances, gardening,[7] and mowing. The ALJ did not address Dr. Grgurich's assessment that plaintiff was limited to occasionally raising his arms overhead.

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in

---

[7] Plaintiff disputes the ALJ's finding that he engaged in gardening. He testified that he picked vegetables form his parents' garden and from his own "green patch," which reseeded itself and did not require tilling or weeding. The only reference to gardening in the medical record comes from an April 2013 office visit in which plaintiff complained of right shoulder pain after planting a garden.

12

any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942.

Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since April 1, 2015, the application date. (Tr. 20). At steps two and three, the ALJ found that plaintiff had severe impairments of obesity, degenerative disc disease of the cervical and lumbar spine, right shoulder impairment, hearing loss, tinnitus, depression, and attention deficit hyperactivity disorder. (Tr. 20-21). The ALJ found that plaintiff's sleep apnea, right knee impairment, and left ankle impairment were not severe. Plaintiff does not challenge the ALJ's findings regarding his severe impairments. The ALJ then determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[8] (Tr. 21-23).

The ALJ next determined that plaintiff had the RFC to perform light work, except that he could frequently reach overhead and in all directions bilaterally. He could never climb ladders, ropes or scaffolds, and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He could occasionally be exposed to vibration and operate a motor vehicle. He could work in a moderate noise environment. He was limited to simple and routine tasks and simple work decisions. (Tr. 23). In assessing plaintiff's RFC, the ALJ summarized medical and opinion evidence, as well as plaintiff's statements regarding his abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 24).

---

[8] For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had moderate limitation in his abilities to understand, remember and apply information, and in maintaining concentration, persistence, and pace. He had no limitation in interacting with others and mild limitation in adapting or managing himself. He did not satisfy the paragraph C criteria. (Tr. 22-23).

At step four, the ALJ concluded that plaintiff was unable to perform his past relevant work. (Tr. 26). His age on the application date placed him in the "younger individual" category. He had at least a high school education and was able to communicate in English. Id. The transferability of job skills was not material because using the Medical-Vocational Rules as a framework supported the finding that plaintiff is not disabled, whether or not he has transferrable skills. (Tr. 27). The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a cashier II and collator operator. (Tr. 27-28). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from April 1, 2015, the alleged onset date, through April 21, 2017, the date of the decision. (Tr. 19).

## V. Discussion

Plaintiff argues that substantial evidence in the record as a whole does not support the ALJ's determination that he has the RFC to frequently reach in all directions including overhead because his treating physician limited him to occasional reaching above shoulder level.

The regulations define "occasionally" as occurring from very little up to one-third of the time, and "frequently" as occurring from one-third to two-thirds of the time. Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983). In this case, the distinction between "occasional" and "frequent" is material because the vocational expert testified that no work would be available for an individual with plaintiff's age, education, and work experience who was limited to light work who was also restricted to only occasional reaching in all directions bilaterally.

16

Plaintiff's treating physician Dr. Grgurich stated that plaintiff could occasionally lift his arms above the shoulders. (Tr. 1020). In support, she provided a description of plaintiff's symptoms, pertinent medical history, diagnoses, and recent medical findings. A review of the medical records establishes that plaintiff had longstanding complaints of bilateral shoulder pain, which were treated with injections and medications without lasting effect. (Tr. 740-42, 736-39, 733-35, 730-32, 725-29, 920-23). His complaints are also supported by objective medical evidence. X-rays of plaintiff's right shoulder taken in May 2013 disclosed possible impression on the rotator cuff by the clavicle, mild arthritis, minimal downsloping of the acromion, and suspected calcific tendinosis of the rotator cuff. In June 2016, tests for injury to the right supraspinitus ligament were positive. (Tr. 914). And, in January 2017, plaintiff was diagnosed with a torn rotator cuff of the right shoulder. In addition, plaintiff had a number of spine complaints that might contribute to or manifest as shoulder pain.

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[9] Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. Id. If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the

---

[9]This continues to be true for plaintiff's claim because it was filed before March 27, 2017. Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. § 404.1527(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ gave weight to portions of Dr. Grgurich's opinion. In particular, the ALJ found that "Dr. Grgurich's findings of light work[10] and frequent manipulative abilities" was consistent with the objective diagnostic and clinical findings in the record. (Tr. 25). The ALJ rejected Dr. Grgurich's opinion that plaintiff could only work an hour a day as inconsistent with his reports regarding his own activities. The ALJ neither adopted nor rejected Dr. Grgurich's restriction of plaintiff to no more than occasionally raising his arms above shoulder level.

Defendant argues that the ALJ adequately accounted for plaintiff's shoulder impairments by limiting him to no more than "frequent" overhead reaching. The issue presented here, however, is that the ALJ failed to address Dr. Grgurich's assessment and thus did not provide "good reasons" for accepting or rejecting her opinion. Defendant further argues that the ALJ's limitation to frequent overhead reaching is supported by Dr. Sylvara's finding that plaintiff had good range of motion in his upper extremities. Other providers, however, found that plaintiff's range of motion was more restricted or was accompanied by pain.[11] (Tr. 730-32, 334-36, 725-29). As the ALJ noted, Dr. Sylvana saw plaintiff only once and there is no basis in the present

---

[10] The ALJ paraphrased Dr. Grgurich's findings which did not use the phrase light work. Light work does not, by its definition, require that plaintiff be able to reach overhead. Cassidy v. Barnhart, 464 F. Supp. 2d 864, 868 n.3 (E.D. Mo. 2006) (citing 20 C.F.R. 404.1569a(c)(vi).

[11] In addition, Dr. Flood noted that plaintiff had only slightly reduced range of motion despite a torn rotator cuff. (Tr. 36-37).

record for concluding that his single observation is more persuasive than that of the treating providers.

The Court finds that the ALJ erred in failing to address Dr. Grgurich's assessment that plaintiff was limited to occasional bilateral reaching above shoulder level and that the error was not harmless.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of June, 2019.